OPINION
{¶ 1} Appellant, Jerry Butcher, appeals from the judgment entered by the Ashtabula County Court of Common Pleas. The trial court sentenced Butcher to a total prison sentence of three life terms for his convictions for three counts of rape and two counts of kidnapping.
 {¶ 2} On November 13, 2003, "T" and "D," aged six and five, respectively, were at the home of their grandmother, Mary Beth Askew ("Mary Beth"), for an overnight visit. That evening, the girls, who are the children of Mary Beth's daughter, Bethany Askew ("Bethany"), were accompanied by their younger brother. According to Mary Beth, the children frequently visited her home.
 {¶ 3} Mary Beth was emptying the dishwasher while the girls were taking a bath together in the bathroom just adjacent to the kitchen area. Following their bath, the girls appeared in the bathroom doorway, acting very agitated and nervous. At trial, Mary Beth testified that the girls "were moving, like, from one foot to the other * * * and looking at each other and one would say [to the other] `you tell her. No, you tell her. Oh, let's tell her together. Okay, we're going to tell her on the count of three.'"
 {¶ 4} The girls then dropped to the floor "like little rag dolls," crying and moaning, and told Mary Beth that "Jerry was sexing with them." Mary Beth stated that she walked up to where the girls were lying on the floor and put her arms around them, attempting to console them. At first, Mary Beth did not know who "Jerry" was, so she asked, and the girls told her "Jerry, who lives with Auntie Porsha." When she questioned the girls further, Mary Beth learned that Jerry had "put his man thing in them" and that this happened "at Jerry's house." Mary Beth was able to identify "Jerry" as Butcher.
 {¶ 5} Naporsha (a.k.a. Porsha) Turner is the sister of T's father. Butcher lived with Turner in an apartment in Ashtabula, Ohio and is the father of Turner's two children, Corey and Kaylee. Butcher also has a son, Jared, from a previous relationship.
 {¶ 6} After Mary Beth managed to get the girls calm, she called her daughter Bethany and relayed what the girls had told her. Bethany subsequently called the police. The next day, Mary Beth and Bethany met with police and made a report.
 {¶ 7} Butcher was charged with three counts of rape, in violation of R.C. 2907.02, first-degree felonies, and two counts of kidnapping, in violation of R.C. 2905.01, first-degree felonies. One count each of kidnapping and rape alleged acts against T, while the remaining two rape charges and the final kidnapping charge alleged acts against D. Butcher pled not guilty to the charges, and a jury trial was held. The following testimony occurred at the jury trial.
 {¶ 8} Bethany stated that T had spent the night at Butcher and Turner's house "numerous times," but that D, who is not related to Turner, had only spent the night there twice. Bethany testified that the last time either child spent the night was after Kaylee's first birthday party, which took place on September 6, 2003, at Nappi's Roller Den in Ashtabula, Ohio.
 {¶ 9} T and D both testified at trial. D recalled attending a skating party on the day of the incident, but could not remember where the party had taken place. D did recall spending that night at Turner and Butcher's home. D testified that while at Turner's house, she was sitting on the couch watching cartoons when Butcher summoned T and D upstairs to his bedroom. At the time, Turner was downstairs with the baby.
 {¶ 10} Once in the room, the door was closed and Butcher ordered the girls to get naked. Although D did not remember who closed the door, T testified that Butcher shut and locked the door. D testified that Butcher had them lay face down on the bed and Butcher got on top of them. She reported that he put his "thingy" into "our private," which she said meant her "butt" and her "mouth." D did not specifically state what Butcher's "thingy" meant, but when asked, pointed to the area between her legs to indicate where Butcher's "thingy" was located. She said that when Butcher put his "thingy" in her "butt" she felt sad, but it did not hurt. D testified that Butcher then put his "thingy" in her mouth.
 {¶ 11} Afterwards, D stated that Butcher made T lie down and put his "thingy" in her "butt." D then testified that "after we were done, we had to go downstairs." When asked to identify "Jerry," D was unable to point out Butcher in the courtroom.
 {¶ 12} T also testified at trial, remembering that there was a skating party that day, but she could not remember the exact date of the party. After the skating party, T remembered going to Turner's apartment in the late afternoon or evening. T knew that "Jerry" was Turner's boyfriend. T testified that she and D went to the room upstairs because "Aunt Porsha called us in and then she told us that Jerry wanted us upstairs and then we went upstairs to see what he wanted." T continued to testify as follows:
 {¶ 13} "He told us to get naked and then he got naked and then after that, we sat down on the bed and then Jerry — Jerry put on this flavored stuff. It was banana in this tube and it didn't really come out, so he had to take off the lid and get some and put it on his private. And then he told [D] to lay down on the bed and she did. Then after that I was * * * sitting down on the bed looking around the room while Jerry — Jerry and [D] were on the bed. [D] was laying face down and Jerry was on top of her and his private was in her butt. * * * Then, after that, he did the same thing to me and I was laying the same way as [D] and he put more of that banana flavored stuff on it and he stuck his private in my butt, and then after that, he got his clothes on and we got our clothes on and he unlocked the door and then he opened it and then he told us not to tell anybody because he would go to jail, and so we went downstairs and we sat. We sat on the couch with the kids and we watched cartoons."
 {¶ 14} When asked what she had meant by Butcher's "private," T said it was "under his stomach and between his legs," on the front part of his body. T testified that she knew the "stuff" Butcher put on his "private" was banana-flavored because it "said it on the tube right under it." T stated that she was not looking the entire time that Jerry was doing things to D, but that she heard her crying. T testified that when Butcher did the things to her, she was crying too. When asked to identify the "Jerry who lives with Auntie Porsha," T was able to identify Butcher in the courtroom.
 {¶ 15} Dr. Stephanie Dewar, a pediatrician from Tod Chidren's Hospital in Youngstown, Ohio, testified for the state. Dr. Dewar is also the Medical Director of the Child Advocacy Center, which examines children in cases of suspected child abuse. Dr. Dewar examined both girls on November 25, 2003.
 {¶ 16} Dr. Dewar testified as to what had been reported to her by the children, Mary Beth, and Bethany and, also, regarding the results of each child's physical examination. Dr. Dewar testified that her examination of D revealed an anal fissure, normally not present, and a flattening out of the folds in the anal area. T's physical examination revealed similar results. Dr. Dewar noted that these results were considered "consistent with anal penetration," but "not diagnostic" of it. Dr. Dewar testified that her "impression after evaluation * * * was that there were physical findings present and evaluation was consistent with sexual abuse."
 {¶ 17} Butcher testified in his own defense that on the date in question, he took his son Jared to a Little League double-header in Andover, Ohio. This testimony was corroborated by defense witness Tim Lesperance, who testified that Butcher and Jared were at the games until some time between 2:30 and 3:30 p.m. Following the games, Butcher testified that he and Jared went to Ashtabula Mall to have something to eat and returned home prior to Turner returning home with Corey and Kaylee. Butcher then testified that Turner took Corey and Kaylee to WalMart to spend some of Kaylee's birthday money on presents, leaving him alone in the house with Jared. Butcher testified that T and D did not spend the night at his house and denied that he had anything to do with the alleged acts.
 {¶ 18} The jury returned guilty verdicts on all five counts of the indictment. Upon sentencing, the trial court determined that the kidnapping counts were allied offenses of similar import and merged them with the rape counts. Butcher was sentenced to three mandatory life terms on the rape counts, to be served concurrently.
 {¶ 19} Butcher has timely appealed the trial court's judgment to this court. He raises two assignments of error for our review. His first assignment of error is:
 {¶ 20} "The trial court erred to the prejudice of the appellant in admitting hearsay statements which did not fall within any exception to the prohibition of Evid.R. 802 against their admissibility."
 {¶ 21} Butcher challenges the admissibility of certain testimony from Mary Beth, claiming it contained hearsay statements that are not subject to any exception and, therefore, should have been excluded. Butcher maintains that the failure to exclude these statements was prejudicial error warranting reversal of his convictions.
 {¶ 22} "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice."[1] "The term `abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."[2]
 {¶ 23} Part of Mary Beth's testimony during direct examination related to statements the girls made when they initially reported the abuse to her. The record reveals that the trial court admitted, over the objections of Butcher's defense counsel, such statements as "Jerry was sexing with [us]," "he put his man thing in us," that the incident occurred "at Jerry's house," and that "Jerry would be mad at [us] because he'll have to go to jail."
 {¶ 24} Evid. R. 801(C), defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible at trial, unless it falls under an exception to the rules of evidence.[3]
 {¶ 25} Under Evid.R. 801(A), a statement is defined as an oral or written assertion or other nonverbal conduct of a person, "if it is intended by him as an assertion." The declarant is the individual who makes the statement.[4] In the instant matter, the testimony of Mary Beth is unquestionably hearsay as it related to out-of-court statements made by the girls, who are the declarants, which were offered to prove the truth of the matter asserted.
 {¶ 26} The state counters that even if the statements are hearsay, they are otherwise admissible under the "excited-utterance" exception to the hearsay rule, contained in Evid.R. 803(2). If applicable, the exception is valid regardless of whether the declarant is available as a witness.[5]
 {¶ 27} An excited utterance is "[a] statement relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition."[6] The rationale for the admission of these statements is that the shock of the event causes the declarant's reflective process to be halted. Thus, the statement is unlikely to have been fabricated and carries a high degree of trustworthiness.[7]
 {¶ 28} The state correctly notes that there has been a trend in recent years to liberalize the application of the excited-utterance exception to cases that involve the sexual abuse of children. Regarding declarations that are made by children of tender years, the Supreme Court of Ohio has held "each case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation."[8]
 {¶ 29} In the case sub judice, while it is apparent the children were still showing the effects of the stress of the event, we cannot conclude that the statements made by the girls were not the result of reflective thought. Mary Beth's testimony clearly establishes that T and D deliberated before they disclosed the alleged sexual assault to her, as evidenced by the children debating back and forth about which one would tell her before finally agreeing to disclose the information "on the count of three."
 {¶ 30} In addition, we note the girls' statements to Mary Beth did not occur until more than two months after the alleged incident. The Supreme Court of Ohio has held:
 {¶ 31} "There is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought."[9]
 {¶ 32} This court has held that the time gap for a young child may be longer than that of an adult, because a child "'may be under stress caused by the events for a longer period of time than adults.'"[10]
 {¶ 33} While there are some cases supporting the proposition that statements made following a lapse of time of greater than two months from alleged sexual abuse may be admissible as excited utterances, each is distinguishable from the case sub judice. One case was decided based upon the "limited reflective abilities" of the declarant or the character of the statement being "sufficiently spontaneous to qualify as admissible hearsay."[11] Other cases were decided upon a combination of the relative youth of the child and the stress from the "startling event" being not the sexual assault itself, but a subsequent event that caused the "stress of excitement" of the earlier sexual assault to reoccur.[12]
 {¶ 34} In the instant case, no such circumstances exist. It is undisputed that the girls did not disclose any information about the incident to anyone for over two months. The evidence shows that the girls did not become upset until after they made the announcement to Mary Beth. Additionally, merely being "upset," without more, does not meet the standard of admissibility under Evid.R. 803(2).[13] The declarations lacked the spontaneous quality necessary for an excited utterance.
 {¶ 35} We note several of the girls' statements to Mary Beth occurred in response to Mary Beth's follow-up questioning to their initial statement. Regarding the admissibility of an "excited utterance" statement resulting from questioning, the Supreme Court of Ohio has held:
 {¶ 36} "'The admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties.'"[14]
 {¶ 37} We have concluded that the girls' initial statements were a product of reflective thought and do not qualify as excited utterances. Therefore, any subsequent statements made to Mary Beth as a result of her follow-up questioning were likewise derivative of the reflective thought process and were not made as a result of the stress of the alleged abuse.
 {¶ 38} Accordingly, we conclude the trial court's admission of Mary Beth's testimony regarding the hearsay statements of the girls was error.
 {¶ 39} Butcher's first assignment of error has merit.
 {¶ 40} Butcher's second assignment of error is:
 {¶ 41} "The appellant was denied the effective assistance of counsel, contrary to his rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I, of the Ohio Constitution."
 {¶ 42} Butcher argues that the testimony of Dr. Dewar and Bethany contained inadmissible hearsay statements. He claims his trial counsel's failure to object to these alleged errors constitutes ineffective assistance of counsel, requiring the reversal of his convictions.
 {¶ 43} In State v. Bradley, the Supreme Court of Ohio adopted the following test to determine if counsel's performance is ineffective: "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance."[15]
 {¶ 44} Our first inquiry is whether trial counsel's performance fell below an objective standard of reasonable representation for failing to object to the statements. Thus, we will determine whether the testimony of these witnesses contained inadmissible hearsay statements.
 {¶ 45} Butcher complains about two statements made by Bethany in response to direct examination. In response to the prosecution's line of questioning about the number of times D had visited Butcher's home, Bethany responded that D had only visited the home twice, the last time being the day of Kaylee's birthday party. When asked why that date stood out in her mind, Bethany's testimony was "that was the last time my girls were around them and they told my mom that [Butcher] had touched [them]." In response to the questioning of the prosecutor related to the reason Bethany sent the girls to see a counselor, she responded "because they said that they had intercourse with Jerry Butcher."
 {¶ 46} Regarding the first statement, Bethany testified as to what the girls told her mother, who then relayed this information to Bethany. Regarding the second statement, Bethany testified that the "girls said" the statement, but does not indicate to whom the girls made the statement. We will presume this statement was also made to Mary Beth, who relayed it to Bethany. This is because Bethany did not testify that the girls ever directly told her about the alleged events. Moreover, both Mary Beth and Bethany testified that the girls initially told Mary Beth, who relayed the information to Bethany.
 {¶ 47} Accordingly, to properly review Bethany's in-court testimony, we must engage in a double-hearsay analysis pursuant to Evid.R. 805, which provides that each part of a statement must conform to an exception to the hearsay rules in order for the entire statement to be admissible.[16] Here, there are two levels of potential hearsay. First, the girls made statements to Mary Beth, then Mary Beth relayed those statements to Bethany, and, finally, Bethany testified regarding those statements in court.
 {¶ 48} An example of double hearsay occurred in the case of State v.Turvey.[17] In State v. Turvey, the Fourth Appellate District held that the double-hearsay statement, where the witness testified as to what a child told to the child's mother, was inadmissible.[18]
 {¶ 49} In State v. Awkal, the Supreme Court of Ohio addressed the issue of double hearsay. In that case, the victim's attorney testified as to what the victim told the attorney regarding a threat from the defendant.[19] The statement from the victim to the attorney was arguably admissible pursuant to Evid.R. 803(3), because it concerned the victim's then-existing mental state.[20] However, the initial statement threatening the victim from the defendant was not admissible.[21] Therefore, the Supreme Court of Ohio held that the attorney's entire testimony on this issue was inadmissible.[22]
 {¶ 50} In the case sub judice, working backwards, the level of the statements from Mary Beth to Bethany are arguably not hearsay. This is because the statements were not offered to prove the truth of the matters asserted, i.e. that Butcher had sexual conduct with the girls, but, rather, were offered to show Bethany's state of mind as to why the date stood out in her mind and why she took to the girls to counseling. However, the next level of the statements that needs to be examined are the girls' statements to Mary Beth that Butcher had sexual conduct with the girls. As noted in our prior analysis, these statements were hearsay, as they were made out of court and sought to prove the truth of the matter asserted. These statements are not admissible under any of the hearsay exceptions. Since the initial level of the statements were inadmissible, Bethany's entire testimony on this issue was inadmissible.[23] The bottom line is that Mary Beth's statements as to what the girls told her are inadmissible. Those same statements do not become admissible when they are relayed to the court through a third party.
 {¶ 51} Butcher's trial counsel's performance fell below an objective level of reasonable representation due to counsel's failure to object to Bethany's testimony. Trial counsel properly objected when Mary Beth testified as to what the girls told her. It was necessary for counsel to object when Bethany testified as to what the girls told Mary Beth. These inadmissible hearsay statements directly pertained to the ultimate issue of Butcher's guilt. Trial counsel should have objected to them.
 {¶ 52} Butcher also challenges statements made by Dr. Dewar, including "the children's recitation of the events as well as the identity of their abuser being Mr. Butcher." In addition, we note the state introduced copies of the medical reports of Dr. Dewar's examinations of the girls and these reports were admitted as exhibits. These reports contain similar hearsay statements regarding the identity of the perpetrator and a description of the events. The state argues that these statements were made for the purposes of diagnosis and treatment and, therefore, admissible under Evid.R. 804.
 {¶ 53} The day trial began, defense counsel filed a motion in limine seeking to exclude "all statements made to any * * * social worker, nurse or doctor of the Tri-County Advocacy Center," arguing that the totality of the circumstances supported a conclusion that the children were taken to the center, not for the purposes of diagnosis and treatment, but for the purposes of investigation and prosecution. The trial court conditionally granted Butcher's motion in limine "depend[ent] upon the evidence establishing a recognized exception to the hearsay rule."
 {¶ 54} The granting of a motion in limine, alone, will not preserve error for review.[24] Instead, a proper objection must also be made at trial at the time the allegedly inadmissible evidence is introduced.[25]
 {¶ 55} We will now turn to whether Dr. Dewar's testimony contained hearsay statements, which should have been objected to.
 {¶ 56} Evid.R. 803(4) creates an exception from the hearsay rule for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
 {¶ 57} Statements in furtherance of diagnosis or treatment are presumed reliable since the effectiveness of the treatment depends on the accuracy of the information related.[26] "Statements made by a child during a medical examination identifying the perpetrator of sexual abuse, if made for purpose of diagnosis and treatment, are admissible pursuant to Evid.R. 803(4), when such statements are made for the purposes enumerated in that rule."[27] This court has interpretedState v. Dever, as follows:
 {¶ 58} "[P]ursuant to Dever, statements made by a child to a medical professional are not automatically excluded simply because the child did not possess the initial motivation to seek diagnosis or treatment, but rather were directed there by an adult. Once at the medical professional's office, however, it must be established that the child's statements were made for the purpose of medical diagnosis or treatment."[28]
 {¶ 59} Unlike adults, young children may not appreciate the medical significance of an interview with a doctor. Thus, in the case of a child of tender years, the Supreme Court of Ohio recommended that trial courts consider, through a voir dire examination of the child, the circumstances surrounding the child's making of the statements to medical personnel before admitting the statements under Evid.R. 803(4).[29] Such circumstances include "the type of environment the child was placed in, the attire of the [interviewer], the presence of other medical professionals, or any other circumstance which would heighten the child's awareness that the questions asked were for the purpose of medical diagnosis or treatment."[30]
 {¶ 60} If, after reviewing the applicable circumstances, the trial court concludes that the child's statements to the medical professional were made for the purposes of medical diagnosis, the court should admit the statements.[31] "If, however, the trial court does not find sufficient factors indicating that the child's statements were made for the purpose of medical diagnosis or treatment, the statements must be excluded as not falling within the ambit of Evid.R. 803(4)."[32]
 {¶ 61} Butcher argues that the aforementioned statements were improperly admitted under Evid.R. 803(4), since the trial court failed to voir dire T and D to establish a foundation for the admission of the testimony. Prior to the second day of trial, the court conducted an in-chambers discussion related to the pending testimony of Dr. Dewar. The court elected to allow Dr. Dewar to testify, despite the fact that no voir dire had been conducted on the children.
 {¶ 62} Since no voir dire was conducted, we will examine the surrounding circumstances, as gleaned from the other evidence in the record, to determine whether the record contains sufficient evidence that the girls' statements to Dr. Dewar were made for the purposes of medical diagnosis or treatment.
 {¶ 63} Dr. Dewar testified that the identity of an alleged abuser is an important consideration to determine the "risk of transmission of sexually transmitted diseases" and because of "safety issues of the child." Thus, she concluded that a child's identification of the alleged abuser is made for the purposes of medical diagnosis and treatment. However, her testimony is not supported by the facts of this case. The medical reports have a section regarding sexually transmitted diseases. These reports indicate that neither girl was tested for sexually transmitted diseases. If Dr. Dewar was so concerned about sexually transmitted diseases that she needed to ascertain the identity of the alleged perpetrator for this reason, the question that arises is — why were the girls not tested for sexually transmitted diseases?
 {¶ 64} It is important to review the facts as to how the children arrived at the Child Advocacy Center. Mary Beth testified that she took the girls to the Ashtabula Clinic in relation to the alleged abuse by Butcher. The girls were examined by a doctor at this facility. Mary Beth testified that she and Bethany were directed to take the girls to see Dr. Dewar by Ashtabula County Children Services Board ("children services"). Further, Detective Joseph Cellitti of the Ashtabula City Police Department testified for the state. He testified he did not interview the children in this matter. Instead, he referred them to the Child Advocacy Center for the purposes of an interview and examination.
 {¶ 65} Further, the evidence in this matter indicates the social worker from children services actually went to the Child Advocacy Center. The medical reports indicate the social worker was present at the hospital when the girls were examined by Dr. Dewar.
 {¶ 66} In this matter, Dr. Dewar amounted to a "manufactured witness" for the state. The girls had already received medical attention from a private doctor for the alleged abuse. They were taken to see Dr. Dewar upon the recommendation of state agents, namely children services and the police. It is readily apparent that Dr. Dewar's primary function was to collect evidence to support a conviction. At trial, even the trial court stated, "I'm telling you [Dr. Dewar] is an advocate * * * her job is to try and get convictions."
 {¶ 67} Officer Cellitti specifically testified that he did not interview the children and referred them to the Child Advocacy Center to be interviewed. Thereafter, he testified that he reviewed the reports from the Child Advocacy Center and, based in part upon those reports, determined that Butcher was a suspect in this matter.
 {¶ 68} We note Dr. Dewar testified that she conducted the interviews with the girls herself. However, a doctor is not permitted, during a medical examination, to assume the role of a police investigator, elicit statements from the alleged victims, and, then, testify regarding those statements under the guise that they were given for the purpose of medical diagnosis or treatment.
 {¶ 69} This court has previously held that, although a voir dire of the child is desirable, Dever "does not actually mandate a voir dire."[33] However, it is imperative to voir dire the children in a case like this where the doctor at issue is not the children's regular pediatrician but, rather, is a state-selected, child-abuse investigator. Children services, the police, the mother, the grandmother, and the doctor all knew this examination was for the purpose of collecting evidence. How then, can the children be presumed to know that it was for some other purpose?
 {¶ 70} Without the benefit of a voir dire examination, the remaining portions of the record do not contain sufficient indicia that the girls' statements to Dr. Dewar were made for the purposes of medical diagnosis or treatment. Thus, Dr. Dewar's testimony contained inadmissible hearsay statements.
 {¶ 71} While we have concluded that the statements made to Dr. Dewar were inadmissible because she was, in effect, a "manufactured witness," we recognize that specialized medical professionals such as Dr. Dewar will continue to play an important role in abuse cases. Dr. Dewar's testimony regarding her physical examinations of the girls was relevant and admissible. Our opinion criticizing the use of a "manufactured witness" to introduce a child's quasi-police statement into evidence should not be construed to prohibit the use of a state-selected doctor to obtain forensic or medical evidence to support the state's case. Further, our opinion does not challenge the admission of a child's statement made to a medical provider if it is demonstrated that the statement was made for the purpose of medical treatment or diagnosis as permitted by Evid.R. 803(4).
 {¶ 72} Trial counsel's performance fell below an objective level of reasonable representation due to counsel's failure to object to the inadmissible hearsay statements in Dr. Dewar's testimony. Since counsel filed a motion in limine on this exact issue, it was inexcusable for counsel to fail to object when Dr. Dewar testified regarding the girls' statements.
 {¶ 73} We have found that the performance of Butcher's trial counsel was deficient for failing to object to the hearsay statements in the testimony of Bethany and Dr. Dewar. The next inquiry is whether Butcher was prejudiced by these statements.
 {¶ 74} In this matter, Dr. Dewar testified regarding the girls' statements identifying the alleged abuser as Butcher and the narrative background she was given about the incident. This testimony functioned as Dr. Dewar bolstering the girls' testimony and vouching for their credibility.
 {¶ 75} As to the testimony from Bethany, we note it was substantially similar to that of Mary Beth. However, Mary Beth's testimony regarding the girls' statements was inadmissible hearsay. Thus, the inadmissible hearsay was presented to the jury a second time through Bethany's testimony.
 {¶ 76} We conclude that Butcher was prejudiced by his trial counsel's failure to object to the inadmissible hearsay statements contained in the testimony of Bethany and Dr. Dewar.
 {¶ 77} Butcher's second assignment of error has merit.
 {¶ 78} Generally, the improper admission of a single hearsay statement may be considered "harmless" error. This may be especially true if the victim directly testifies to the alleged events. However, the amount of inadmissible hearsay used in this case is significant. Four different adults (Mary Beth, Bethany, Dr. Dewar, and Detective Cellitti) testified that Butcher was the culprit of the offenses. The medical reports also listed Butcher as the alleged perpetrator. In addition, three of the adults (Mary Beth, Bethany, and Dr. Dewar) specifically testified that Butcher had sexual conduct with the girls. Obviously, none of the adults were present at the time the alleged abuse occurred. Therefore, all of these adults formulated their opinions regarding Butcher based on what the girls told them or other individuals. By definition, these were hearsay statements. As we have concluded, these hearsay statements do not fall within any hearsay exception.
 {¶ 79} We note the girls testified as to the alleged events. The prejudice arises when numerous adults repeat the girls' stories in court. If a statement is repeated often enough, it is more susceptible to belief. Additionally, the repetition has the effect of the adults vouching for the veracity of the statements. For example, members of the jury may think, if Dr. Dewar believed the girls' statements, maybe we should too.
 {¶ 80} Moreover, certain portions of the girls' testimony was suspect. Specifically, D could not identify Butcher in court. T testified that her aunt, Turner, facilitated the crimes by instructing the girls to go to the room to be alone with Butcher. T testified that D was crying during the incident, but D testified that she did not cry.
 {¶ 81} There was evidence regarding the girls' physical injuries. Dr. Dewar testified that the girls' injuries were "consistent with" but not "diagnostic of" sexual abuse. Also, she testified that other things could cause these types of injuries. Accordingly, the medical evidence is equivocal regarding the occurrence of the abuse. More importantly, the medical evidence did not, in any way, link Butcher to the alleged crimes.
 {¶ 82} As a result of the numerous hearsay statements presented in this matter, we cannot conclude Butcher had a fair trial.
 {¶ 83} The judgment of the trial court is reversed. This matter is remanded to the trial court for a new trial.
[1] State v. Nolling, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 43, citingState v. Issa (2001), 93 Ohio St.3d 49, 64.
[2] State v. Adams (1980), 62 Ohio St.2d 151, 157.
[3] Evid.R. 802.
[4] Evid.R. 801(B).
[5] Evid.R. 803. See, also, State v. Bowles (Apr. 28, 1998), 10th Dist. No. 97APA09-1213, 1998 Ohio App. LEXIS 1889, at *11.
[6] Evid.R. 803(2).
[7] State v. Taylor (1993), 66 Ohio St.3d 295, 300, quoting Staff Note to Evid.R. 803(2), citing McCormick, § 297 (2d ed. 1972).
[8] State v. Duncan (1978), 53 Ohio St.2d 215, 219-220.
[9] (Emphasis in original.) State v. Taylor, 66 Ohio St.3d at 303.
[10] (Citation omitted.) State v. Reed (May 31, 1991) 11th Dist. No. 89-L-14-130, 1991 Ohio App. LEXIS 2496, at *15-16.
[11] State v. Negolfka (Nov. 19, 1987), 8th Dist. No. 52905, 1987 Ohio App. LEXIS 9645, at *8.
[12] See State v. Dubose (Nov. 22, 1989), 8th Dist. No. 56174, 1989 Ohio App. LEXIS 5201, at *5-7; and State v. Kincaid (Oct. 18, 1995), 9th Dist. Nos. 94CA005942 and 94CA005945, 1995 Ohio App. LEXIS 4638, at *11-14.
[13] State v. Taylor, 66 Ohio St.3d at 303
[14] State v. Simko (1994), 71 Ohio St.3d 483, 490, quoting State v.Wallace (1988), 37 Ohio St.3d 87, paragraph two of the syllabus.
[15] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus, adopting the test set forth in Strickland v. Washington
(1984), 466 U.S. 668.
[16] See, e.g., State v. Vinson (1990), 70 Ohio App.3d 391, 399.
[17] State v. Turvey (1992), 84 Ohio App.3d 724.
[18] Id. at 745-746.
[19] State v. Awkal (1996), 76 Ohio St.3d 324, 330.
[20] Id. at 331.
[21] Id.
[22] Id.
[23] Evid.R. 805.
[24] State v. Stewart (Dec. 8. 1997), 4th Dist. No. 96CA18, 1997 Ohio App. LEXIS 5625, at *12, citing State v. Hill (1996), 75 Ohio St.3d 195,202-203.
[25] State v. Stewart, at *12, citing State v. Brown (1988),38 Ohio St.3d 305, paragraph three of the syllabus and State v. Grubb (1986),28 Ohio St.3d 199, paragraph two of the syllabus.
[26] (Citation omitted.) State v. Boston (1989), 46 Ohio St.3d 108,121.
[27] State v. Dever (1992), 64 Ohio St.3d 401, paragraph two of the syllabus.
[28] In re Corry M. (1999), 134 Ohio App.3d 274, 282.
[29] State v. Dever, 64 Ohio St.3d at 410.
[30] State v. Griffith, 11th Dist. No. 2001-T-0136, 2003-Ohio-6980, at ¶ 59.
[31] State v. Jett (Mar. 31, 1998), 11th Dist. No. 97-P-0023, 1998 Ohio App. LEXIS 1451, at *35.
[32] Id., citing State v. Dever, 64 Ohio St.3d 410-411.
[33] State v. Cornwell (Feb. 27, 1998), 95-T-5379, 1998 Ohio App. LEXIS 806, at *32.
DONALD R. FORD, P.J., concurs,
DIANE V. GRENDELL, J., dissents with Dissenting Opinion.